Matter of People of the State of N.Y. v Quality King Distribs., Inc. (2022 NY Slip Op 05010)

Matter of People of the State of N.Y. v Quality King Distribs., Inc.

2022 NY Slip Op 05010

Decided on August 23, 2022

Appellate Division, First Department

 HIGGITT, JJ. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: August 23, 2022
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Sallie Manzanet-Daniels
Martin Shulman Julio Rodriguez III John R. Higgitt

Index No. 451296/20 Appeal No. 16071-16071A Case No. 2020-04338 

[*1]In the Matter of the People of the State of New York, by Letitia James, Attorney General of the State of New York, Petitioner-Appellant-Respondent,
v
Quality King Distributors, Inc., Respondent-Respondent-Appellant, Glenn Nussdorf, Respondent.

Petitioner appeals, and respondent Quality King Distributors, Inc. cross-appeals from the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about September 23, 2020, which denied the petition for injunctive and financial relief under General Business Law § 396-r and Executive Law § 63(12), granted, in part, respondents' motion to dismiss, and, in effect, dismissed the proceeding. Petitioner and respondent Quality King Distributors Inc. both also appeal and cross-appeal from a so-ordered transcript, same court and Justice, dated September 30, 2022.

Letitia James, Attorney General, New York (Philip J. Levitz and Steven C. Wu of counsel), for appellant-respondent.
Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., New York (Anthony J. Viola and Andre K. Cizmarik of counsel), for respondent-appellant.

 HIGGITT, JJ. 

In March 2020 the coronavirus disease 2019 (COVID-19) descended on New York. That month began with a single reported positive case in New York (see New York State Department of Health, https://health.data.ny.gov/Health/New-York-State-Statewide-COVID-19-Testing/xdss-u53e [last accessed July 22, 2022]); by month's end, the number of reported cases in the State exceeded 83,000 (see id.). A significant number of those infected with it died.
COVID-19 occasioned exceptional demand for certain consumer products in the lead up to and the initial phase of what was to become a pandemic. One of those products was disinfectant, such as Lysol, which carried with it the promise of killing the novel coronavirus on household surfaces.
In the special proceeding underlying this appeal, petitioner Attorney General of the State of New York accused respondent Quality King Distributors, Inc. of engaging in price gouging in contravention of General Business Law § 396-r based on its sale of certain Lysol products in the first four months of 2020.[FN1] For the reasons that follow, we reverse Supreme Court's order denying the AG's petition and, in effect, dismissing the proceeding, and remand the matter for further proceedings.
I.
Quality King is a wholesale distributor of consumer products to grocery and discount stores. Quality King's clientele ranges from national chain retailers to independent local retailers. Prior to and during the spring of 2020, Quality King sold Lysol products, including 19-ounce spray cans of the disinfectant, to retailers. (For ease of reference, 19-ounce cans of Lysol will be referred to as the Lysol product.) Quality King's sales of the Lysol product in the first four months of 2020 lie at the heart of this litigation.
The AG is empowered, among other things, to investigate complaints of price gouging and seek appropriate remedies for proscribed price-gouging activities (see General Business Law § 396-r; Americana Petroleum Corp. v Northville Indus. Corp., 200 AD2d 646, 648 [2d Dept 1994]; see also Executive Law § 63[12]).
In February and March 2020, the AG received complaints from consumers regarding [*2]the high prices of Lysol products at retail outlets that purchased those products from Quality King. In response to these complaints and after preliminary investigations into them, the AG sent Quality King a letter demanding that it cease and desist from charging unconscionably excessive prices on disinfectants. The AG later requested that Quality King provide purchase and sale data relating to disinfectants so that it could evaluate whether Quality King had engaged in unlawful price gouging. Quality King, in turn, provided the AG with certain sales information relating to the Lysol product. Later, Quality King provided information regarding the costs it incurred in procuring the Lysol product, and sales information concerning products other than Lysol products.
II.
In May 2020, the AG commenced this special proceeding against Quality King and its CEO under General Business Law § 396-r and Executive Law § 63(12), alleging that Quality King engaged in price gouging of Lysol products.[FN2] According to the AG, since at least January 31, 2020, there was an abnormal disruption of the market for Lysol products; Lysol products were vital and necessary consumer goods; and Quality King unjustifiably sold the Lysol product for unconscionably excessive prices (see General Business Law § 396-r[2]). Notably, on January 31, 2020, the Secretary of the United States Department of Health and Human Services (HHS) declared a national public health emergency pursuant to Public Health Service Act § 319 (42 USC § 247d) based on confirmed cases of COVID-19.
The AG alleged that, from November 2019 through January 2020, Quality King charged a median monthly price of $51 for a 12-pack of the Lysol product, and, coinciding with the rise of the coronavirus in or around the end of January 2020, repeatedly and unjustifiably raised its prices for a 12-pack of the Lysol product in February and March of 2020, leading to unconscionably excessive prices. The AG's allegations are founded on information, including detailed purchase and sales records, provided to the AG by Quality King. With respect to the costs incurred by Quality King in procuring 12-packs of the Lysol product and its gross profit margins, the petition alleged that, despite incurring relatively static purchase costs between November 2019 and March 2020, Quality King's gross profit margin increased each month, culminating in a gross profit margin approximately 75% greater in March 2020 than November 2019.
Based on the information provided to it by Quality King, the AG concluded that, between February 1, 2020 and April 7, 2020, Quality King engaged in at least 432 separate sales of the Lysol product; prices per can charged by Quality King in these transactions ranged from $5.00 to $9.15. Moreover, the AG concluded that those 432 transactions involved at least 3,835 12-packs of the Lysol product, or 46,020 individual cans. The AG maintained that Quality King engaged in price gouging each time one of those cans of the [*3]Lysol product was sold at retail for an unlawfully inflated price. As a result, the AG sought injunctive relief, an accounting, restitution for aggrieved customers, disgorgement of profits, and a civil penalty.
Quality King interposed an answer to the petition, denying the material price-gouging allegations and raising a number of affirmative defenses, including that the price increases associated with the Lysol product were justified because Quality King incurred additional costs in procuring and distributing Lysol products. Additionally, Quality King asserted that General Business Law § 396-r is unconstitutionally vague and therefore void. Quality King subsequently moved to dismiss the petition under CPLR 3211(a)(1) and (7).
III.
After conducting oral argument on the petition and Quality King's motion to dismiss, Supreme Court issued a decision and order on September 23, 2020 denying the petition, granting that aspect of Quality King's motion seeking dismissal of the petition as asserted against Quality King's CEO, and denying any form of relief to the AG. The decision and order, in effect, dismissed the proceeding in its entirety.[FN3] The court wrote, in pertinent part, that
"[o]n balance, considering all of the Lysol products sold immediately before and after the March 7 Governor's Emergency Declaration, the price increases charged by Quality King were not, as a matter of law, unconscionable or overall extreme. While there may have been isolated instances of price increases for [the Lysol product] to certain customers which were seemingly increased to the extreme, Quality King did not uniformly raise [its] prices on Lysol products to these customers. When considered among the panoply of Lysol products offered for sale at that time (which includes Lysol wipes and other size Lysol cans, among other Lysol products, and which [the AG] urges should all be included should the court fashion injunctive relief), all of which were shown to be vital and necessary for health and safety, the pricing overall did not indicate any use of unfair leverage, an abuse of bargaining power or unconscionable means; nor did the pricing represent a gross disparity between the price of the goods and their value measured by the price at which they were sold immediately prior to March 7, 2020. Quality King demonstrated that [its] prices were competitive and even lower that [its] competitors who were offering the same products in the same market. Additionally, Quality King demonstrated [its] own increased cost for [the Lysol product]."
IV.
The AG appealed from the order, and Quality King separately appealed.[FN4]
The AG requests that we reverse the order denying the petition and, in effect, dismissing the proceeding, and remand the matter to Supreme Court for further proceedings. To that end, the AG makes three principal arguments. First, the AG argues that Supreme Court erred in concluding that Quality King could not be held liable for price gouging absent evidence that it had [*4]uniformly gouged prices on all of its Lysol products on and around March 7, 2020, the date Governor Cuomo issued an Executive Order declaring a State disaster emergency occasioned by COVID-19. In relation to this argument, the AG contends that General Business Law § 396-r prohibits each sale made for an unconscionably excessive price  regardless of whether the sales represent a uniform price-gouging scheme. In addition, the AG contends, March 7, 2020 was not the date on which an "abnormal disruption in the market" occurred within the meaning of the statute; rather, the abnormal disruption in the Lysol-product market began in the end of January 2020, continuing and intensifying over the course of the next months, resulting in Quality King's pervasive price gouging through its increasing prices to its customers.
Second, the AG maintains that Quality King failed to discharge its burden of establishing its affirmative defense that its prices were justified by increased costs.
Third, the AG takes issue with Supreme Court's conclusion that no relief was warranted because restitution, disgorgement, or both was too difficult to calculate. The AG stresses that an accounting would aid in the calculation of appropriate awards of restitution and disgorgement. Moreover, the AG presses anew its request for injunctive relief and a civil penalty.
In response, Quality King asserts that the AG failed to make a prima facie showing that it engaged in price gouging, and, in any event, that its evidence demonstrated that it was justified in raising its prices because of increased costs it incurred in procuring and distributing the Lysol product in the first quarter of 2020. Indeed, Quality King contends, the AG has not established when, or even whether, there was an abnormal disruption in the market for the Lysol product. With respect to the AG's contention that the abnormal disruption began in January 2020, Quality King maintains that the AG failed to establish an abnormal disruption in the market beginning on or about January 31, 2020 (the date on which the Secretary of HHS declared a national public health emergency), and therefore failed to demonstrate that Quality King engaged in price gouging starting on that date.
Quality King stresses that, for the purpose of ascertaining whether the party accused of price gouging charged an unconscionably excessive sum for a product, the appropriate comparison under General Business Law § 396-r is between the price at which it sold the Lysol product during the abnormal market disruption and the price it charged immediately prior to the abnormal market disruption. The AG did not, according to Quality King, establish the price it charged for the Lysol product immediately prior to the abnormal market disruption.
Quality King also takes issue with the AG's use of monthly median sales prices and acquisition costs to ascertain whether price gouging occurred, characterizing that use as arbitrary and not authorized by General [*5]Business Law § 396-r. Additionally, Quality King claims that the AG misstated or misrepresented data contained in the sales and purchase information it provided and used an improper methodology to calculate Quality King's profits. According to Quality King, by virtue of the manner in which the AG presented the data and calculated Quality King's profits, the AG greatly exaggerated Quality King's alleged profits to support the price-gouging claim. Further, Quality King argues, the AG failed to demonstrate that the Lysol product was a vital and necessary consumer good within the meaning of General Business Law § 396-r.
As to its justification defense, Quality King insists that it experienced increased procurement costs and overhead expenses (such as increased labor and facility maintenance costs) in March and April 2020, and that, regardless of the date used between the end of January 2020 and the middle of March 2020 to gauge a potential price gouge, its profits did not cover its own increased costs associated with procuring and distributing the Lysol product.
On the subject of the relief sought by the AG, Quality King maintains that, even assuming that it did violate the price-gouging statute, restitution is not appropriate because the AG has not identified those consumers who were aggrieved by Quality King's alleged price gouging, or the extent to which the alleged price gouging caused them harm. With respect to disgorgement of profits, Quality King observes that neither General Business Law § 396-r nor Executive Law § 63(12) expressly authorizes disgorgement as a remedy. An accounting is not warranted, according to Quality King, because it already provided all relevant purchase and sales information. Quality King also objects to the imposition of any injunctive relief because no such relief can be appropriately tailored against it, and there is no reasonable likelihood of a continuing violation because it voluntarily ceased selling the Lysol product.
Regarding its separate appeal from the order, Quality King contends that Supreme Court should have concluded that General Business Law § 396-r is unconstitutionally vague, and therefore void, as applied to it. Quality King argues that General Business Law § 396-r is penal in nature for the purpose of considering constitutional challenges  a characterization demanding stricter judicial scrutiny than if the statute were civil in nature. In particular, Quality King argues that, as applied to it, the following phrases are unconstitutionally vague: "vital and necessary," "unconscionably excessive," and "imminently threatened" in General Business Law § 396-r(2); "unconscionably extreme" in General Business Law § 396-r(3)(a); and "gross disparity," "immediately prior," and "additional costs" in General Business Law § 396-r(3)(b) and (c).
In response to Quality King's constitutional challenges to General Business Law § 396-r, the AG notes that the statute is entitled to a strong presumption of constitutionality[*6], and that Quality King must demonstrate beyond a reasonable doubt that the statute is unconstitutional. The AG argues that General Business Law § 396-r regulates commercial activity and, therefore, is subject to a less strict void-for-vagueness test than that applied to criminal statutes. According to the AG, the statute clearly proscribes certain conduct; sets out sufficiently detailed standards for identifying when a given price is unconscionably excessive and how a respondent may rebut prima facie evidence of an unconscionably excessive price with evidence of increased costs; and expressly defines the key phrase "abnormal disruption of the market." The AG points to several decisions that have, to one degree or another, rejected constitutional challenges to the different versions of General Business Law § 396-r (see People v Two Wheel Corp., 128 AD2d 507 [2d Dept 1987], affd 71 NY2d 693 [1988]; State of New York v Strong Oil Co., 105 Misc 2d 803 [Sup Ct, Suffolk County 1980], affd in part, dismissed in part 87 AD2d 374 [2d Dept 1982]; People v Chazy Hardware, 176 Misc 2d 960 [Sup Ct, Clinton County 1998]).
V.
A.
Section 1 of General Business Law § 396-r contains the Legislature's formal findings and declaration regarding price gouging. In that section, the Legislature stated that
"[it] hereby finds that during periods of abnormal disruption of the market caused by strikes, power failures, severe shortages or other extraordinary adverse circumstances, some parties within the chain of distribution of consumer goods have taken unfair advantage of consumers by charging grossly excessive prices for essential consumer goods and services.
In order to prevent any party within the chain of distribution of any consumer goods from taking unfair advantage of consumers during abnormal disruptions of the market, the legislature declares that the public interest requires that such conduct be prohibited and made subject to civil penalties."
Section 2 of the controlling version of the statute contains the core elements of price gouging:
"During any abnormal disruption of the market for consumer goods and services vital and necessary for the health, safety and welfare of consumers, no party within the chain of distribution of such consumer goods or services or both shall sell or offer to sell any such goods or services or both for an amount which represents an unconscionably excessive price."
The phrase "abnormal disruption of the market" is defined in that section as "any change in the market, whether actual or imminently threatened, resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, war, military action, national or local emergency, or other cause of an abnormal disruption of the market which results in the declaration of a state of emergency by the governor."
Section 3 addresses unconscionable excessiveness, which is a question of law for the court (General Business [*7]Law § 396-r[3]). Under that provision, a proscribed price gouge occurs when the amount of the excess in price is unconscionably extreme, there was an exercise of unfair leverage or unconscionable means, or a combination of those things (General Business Law § 396-r[3][a]).
Thus, to establish a violation of General Business Law § 396-r under the controlling version of the statute, the AG must show (1) an abnormal disruption of the market for a particular good or service; (2) that the good or service was vital and necessary for the health, safety, and welfare of consumers; and (3) that the alleged price gouger sold (or offered to sell) the vital and necessary good or service for an unconscionably excessive price, which is established by showing an unconscionably extreme amount of excess in price, an exercise of unfair leverage or unconscionable means, or both (General Business Law §§ 396-r[2], [3][a]). Moreover, in order to establish a prima facie showing of price gouging, the AG must submit evidence establishing one of two things: either that the amount charged represents a gross disparity between the price of the consumer goods that were the subject of the transaction, on the one hand, and their value measured by the price at which such goods were sold or offered for sale by the defendant in the usual course of business immediately prior to the onset of the abnormal disruption of the market, on the other; or that the amount charged grossly exceeded the price at which the same or similar goods or services were readily obtainable by other consumers in the trade area (General Business Law § 396-r[3][b]). The party accused of price gouging may rebut the prima facie showing by establishing that its increased prices were justified, i.e., that additional costs not within its control were imposed on it for the goods (General Business Law § 396-r[3][c]).
Upon finding that a party has violated General Business Law § 396-r, a court may direct restitution, provide injunctive relief, impose a civil penalty, or grant some combination thereof (General Business Law § 396-r[4]).[FN5] General Business Law § 396-r is a remedial statute designed to promote the public good and should be liberally construed to carry out the reforms intended by the Legislature and to promote justice (see McKinney's Cons Laws of NY, Book 1, Statutes §§ 321, 341; see also Strong Oil Co., 105 Misc 2d at 820; see generally People v Lexington Sixty-First Assoc., 38 NY2d 588, 595 [1976]; Festa v Leshen, 145 AD2d 49, 55-56 [1st Dept 1989]).
 B.

General Business Law § 396-r(4) suggests (and, in any event, the parties tacitly agree) that a price-gouging action by the AG is a special proceeding, the procedure for which is outlined in CPLR article 4.
As is relevant here, based on the pleadings (see CPLR 402) and any submissions offered by the parties or required by the court (see CPLR 403[a], [b]; 409[a]), a special proceeding should be adjudicated in the same manner as a summary judgment motion (see [*8]Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 409, C409 [main vol.]; Siegel & Connors, NY Prac § 556 [6th ed 2018]). Thus, CPLR 409(d) directs that "[t]he court shall make a summary determination upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised. The court may make any other orders permitted on a summary judgment motion." When one or more triable issue of fact is manifested by the parties' submissions in a special proceeding, a trial is warranted (see CPLR 410).
C.
Principles of judicial restraint counsel against reaching constitutional issues when an action can be resolved on nonconstitutional grounds (see Syquia v Board of Educ. of Harpursville Cent. School Dist., 80 NY2d 531, 535 [1992]). Therefore, we analyze first the parties' nonconstitutional contentions regarding the application of General Business Law § 396-r to the facts underlying this proceeding.
1.
As discussed above, the first element under General Business Law § 396-r that the AG needed to establish was an abnormal disruption of the market for the Lysol product. This element entails (1) a finding that a change in the market for the Lysol product occurred, (2) a determination that the change was caused by an enumerated event, and (3) a declaration of the date of onset of the abnormal disruption of the market (§§ 396-r[2], [3][b][i]).
General Business Law § 396-r(2) specifies that an "abnormal disruption of the market" for a good occurs when there is "any change in the market, whether actual or imminently threatened, resulting from stress of weather, convulsion of nature, failure or shortage of electric power or other source of energy, strike, civil disorder, war, military action, national or local emergency, or other cause of an abnormal disruption of the market which results in the declaration of a state of emergency by the governor." This list is cast in the disjunctive, the word "or" separating the first eight entries from the last (i.e., state-of-emergency declaration by the Governor). The events in the list are alternatives. A declaration of a state of emergency by the Governor, therefore, is not a precondition to the onset of an abnormal disruption of a market under the statute (see People v Wever Petroleum, Inc., 14 Misc 3d 491, 494 [Sup Ct, Albany County 2006]).
Here, a change in the market for the Lysol product occurred because, as the AG's submissions indicate, in the face of a public health crisis stemming from a unique virus, demand for disinfectants skyrocketed quickly, straining that market. As Quality King acknowledged in an April 22, 2020 correspondence with the AG, "[b]y February of 2020, if not earlier, it was common knowledge that the manufacturer had sold out [of Lysol products] and was unable to keep up with demand. Without any merchandise coming from the manufacturer, the market for these products tightened as supply dwindled . . . ."
As noted above, we must identify the [*9]cause of and date of the onset of the abnormal market disruption for the Lysol product. The former is important because the price-gouging statute is implicated only if the change in the market was caused by an enumerated event (General Business Law § 396-r[2]). The latter is critical for the purposes of determining whether Quality King charged unconscionably excessive prices and, relatedly, whether the AG made a prima facie showing of price gouging (see General Business Law § 396-r[3][b]).
The calendars of January, February, and March 2020 are marked with a host of events that illustrate the evolution of the COVID-19 crisis.[FN6] But certain dates highlighted by the parties guide our analysis of the cause of and date of onset of the abnormal market disruption of the Lysol product.
On January 30, 2020, the World Health Organization designated the COVID-19 outbreak a "Public Health Emergency of International Concern." The following day, the Secretary of HHS declared that the United States had been under a nationwide "public health emergency" since January 27, 2020. On February 26, 2020, the director of immunization and respiratory diseases at the United States Centers for Disease Control and Prevention (CDC) warned that "[w]e expect we will see community spread in this country"; that same day, the CDC tweeted, "[n]ow is the time for US businesses, hospitals, and communities to begin preparing for the possible spread of #COVID19" (emphasis added). Governor Cuomo's declaration of a state of emergency in New York State occurred on March 7, 2020; the President's declaration of a national state of emergency followed on March 13, 2020.
As of February 26, 2020 the CDC made it plain: COVID-19 posed an imminent threat to the United States that demanded national action. Stated differently, as of February 26, 2020, the United States faced a situation requiring immediate and extraordinary action. We reach this conclusion because by that date, a deadly disease that health care providers and systems in various parts of the world could not contain was likely to spread in our country, and the citizenry needed to proactively brace for the threat. By the time of the CDC's February 26, 2020 warnings, which were preceded by various governmental warnings and advisories and significant novel coronavirus media coverage, there was a change in the market for the Lysol product resulting from a national public health emergency. Therefore, for the purposes of this litigation, the cause of the abnormal disruption of the market for the Lysol product was a national emergency and the onset of the disruption was February 26, 2020.[FN7]
The AG contends that the onset of the national public health emergency was January 31, 2020, the date of the declaration by the Secretary of HHS that the United States was under a nationwide "public health emergency" (and had been so since January 27). That administrative declaration permitted the Secretary to take certain actions to respond to the agency-[*10]declared public health emergency (for example, bringing to bear HHS resources to address the emergency, like making grants, entering into contracts, and conducting and supporting investigations into the cause, treatment, or prevention of the disease) (see HHS, Public Health Emergency Declaration, https://www.phe.gov/Preparedness/legal/Pages/phedeclaration.aspx [last accessed July 22, 2022]), and that declaration certainly suggested that COVID-19 presented a risk to the citizenry. But that risk had not yet graduated to a national emergency within the meaning of General Business Law § 396-r.[FN8]
Similarly, we reject the onset date employed by Supreme Court: March 7, 2020, the date that Governor Cuomo declared a State disaster emergency because of the public health crisis. As discussed above, by February 26, 2020 the nation was experiencing a national emergency within the meaning of General Business Law § 396-r. Using the later-occurring alternative event of the Governor's declaration of a state of emergency would be improper in light of the remedial nature of the price-gouging statute, and because it would potentially permit a period of price gouging to go unchecked (see McKinney's Cons Laws of NY, Book 1, Statutes, § 95 ["The courts in construing a statute should consider the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy"]).
2.
The second element of a General Business Law § 396-r claim that the AG must establish under the controlling version of the statute is that the good that was alleged to have been price-gouged was vital and necessary for the health, safety, and welfare of consumers.
The words "vital" and "necessary" are not defined in the statute. "In the absence of a statutory definition, [courts] construe words of ordinary import with their usual and commonly understood meaning, and in that connection have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase" (Yaniveth R. v LTD Realty Co., 27 NY3d 186, 192 [2016], quoting Rosner v Metropolitan Prop. & Liab. Ins. Co., 96 NY2d 475, 479-480 [2001]). An item is "vital" if it is "of utmost importance" (Merriam-Webster Online Dictionary, vital). An item is "necessary" if it is "absolutely needed" (id., necessary; see Black's Law Dictionary, necessary ["That is needed for some purpose or reason; essential."]).
The parties dispute the extent to which COVID-19 was transmittable from a surface, and, assuming it was, whether Lysol was effective in eliminating or meaningfully limiting any such potential transmission. Regardless of which party is correct in its assessment of the danger COVID-19 presented when lingering on surfaces and Lysol's effectiveness in eliminating or reducing that danger, consumers in the first several months of 2020 had good reason to believe that the virus could be killed if a surface were treated with a disinfectant. The Lysol [*11]product was, at least in the eyes of consumers, of the utmost importance and absolutely needed to address the terrible danger posed by COVID-19. Whatever wisdom hindsight might have to offer regarding the efficacy of Lysol in combatting the coronavirus, we put ourselves in the shoes of the consumer facing the emerging pandemic. In the opening scene of the pandemic, disinfectants, in general, and Lysol products, specifically, were a necessity, not a convenience (see generally Two Wheel Corp., 71 NY2d at 697). To paraphrase Two Wheel Corp., the situation was ripe for overreaching by those selling Lysol products, who enjoyed a temporary imbalance in bargaining power by virtue of an abnormal level of demand, in terms of both the number of customers who desired the product and the sense of urgency that increased that desire (id.).
3.
The third element of a price-gouging claim that the AG must establish is that the good was sold (or offered for sale) for an unconscionably excessive price, which must be demonstrated by an unconscionably extreme amount of excess in price, an exercise of unfair leverage or unconscionable means, or both. To make a prima facie showing of this element, the AG must submit evidence establishing that the amount charged during the period of market disruption represents a gross disparity between the prices of the Lysol product and the price at which the product was sold or offered for sale by Quality King in the usual course of business immediately prior to the onset of the abnormal disruption of the market (General Business Law § 396-r[3][b]).[FN9] To provide for reliable comparisons between pre- and post-onset prices, we give the phrase "immediately prior" a reasonable, not rigid construction (see generally Two Wheel Corp., 71 NY2d at 696, n 1; Chazy Hardware, 176 Misc 2d at 963-964; McKinney's Cons Laws of NY, Book 1, Statutes, §§ 95, 321, 341).
As discussed above, the date of the onset of the abnormal disruption of the market for the Lysol product was, for the purposes of this litigation, February 26, 2020. The benchmarks for gauging whether Quality King engaged in price gouging are therefore the prices it charged for the Lysol product in the usual course of business immediately prior to February 26, 2020. This calculus is complicated slightly because, in the usual course of business, Quality King charged different customers different prices for the same goods. These variations in price were based on several factors (e.g., the type of customer, frequency and size of orders, location of delivery). In light of the detailed purchase and sale information in the record, scrutiny of the individual relevant transactions is feasible and will yield the most accurate results; there is no need to consider median or mean statistics regarding the transactions. Therefore, for each transaction involving the Lysol product that occurred on or after February 26, 2020, generally the price charged for the post-onset transaction must be compared to the [*12]price charged to the same customer immediately prior to February 26, 2020.[FN10]
Employing the February 26, 2020 onset date, our review of the purchase and sale data discloses several instances in which the amount charged to a particular customer in a particular transaction represents, prima facie, a gross disparity between the price of the Lysol product and the price at which it was sold by Quality King in the usual course of business immediately prior to the onset of the abnormal disruption of the market.
For example, Jack's American Outlet (a "deep discount" purchaser), purchased the Lysol product from Quality King on February 24, 2020 at prices ranging from $60.00 to $66.09 per case. It next purchased the Lysol product from Quality King on March 16, 2020 at $88.42 per case, an increase of $22.33 to $28.42.
Drug chain CVS purchased the Lysol product from Quality King on February 26, 2020 for $62.40 per case, purchasing it again on March 11, 2020 for $84.01 per case, an increase of $21.61. CVS made further purchases on March 27, 2020, paying $91.56 per case (an increase of $29.16), and April 1, 2020, paying $95.96 (an increase of $33.56).
Clinton Variety (a local customer) purchased the Lysol product from Quality King on February 18, 2020 at $56.09 and $61.96 per case. When Clinton Variety purchased the Lysol product again on April 1, 2020, the price per case had risen to $108.99, an increase of $47.03 and $52.90.
Thus, the AG's evidence demonstrated, prima facie, that Quality King sold the Lysol product at unconscionably excessive prices on at least several occasions.
4.
In light of that prima facie showing, and the existence of issues of fact as to whether, employing the February 26, 2020 onset date, Quality King engaged in other proscribed price gouging activities, whether and to what extent Quality King's price increases were justified, and, ultimately, the extent of Quality King's price-gouging activities, further proceedings before Supreme Court are warranted. We note that General Business Law § 396-r proscribes any instance of price gouging; the AG need not demonstrate a uniform price-gouging practice for liability to attach under the statute (see General Business Law § 396-r[2]). (A persistent or uniform illegal or fraudulent practice would be material for the purposes of applying Executive Law § 63[12] and the remedies it provides). Moreover, Supreme Court should, in the exercise of its discretion, afford those remedies that it deems appropriate in light of the extent of the price-gouging activities (see General Business Law 396-r[4]; Two Wheel Corp., 71 NY2d at 700), including, if warranted, relief under Executive Law § 63(12).[FN11] To aid its determinations, Supreme Court may order an accounting on such terms as are just, conduct an evidentiary hearing (see CPLR 410), or both.
VI.
Quality King's appeal from the denial of its motion to dismiss the petition on the ground that the price gouging statute is unconstitutionally vague as applied [*13]must be dismissed because Quality King is not aggrieved by the order, which denied the petition (see CPLR 5511; McCormack Family Charitable Found. v Fidelity Brokerage Servs., LLC, 195 AD3d 420, 422 [1st Dept 2021], lv denied 37 NY3d 912 [2021]). Quality King's constitutional challenges are properly before us, however, as an alternative basis to affirm the order on appeal that was rendered in Quality King's favor (see Parochial Bus Sys. v Board of Educ. of City of N.Y., 60 NY2d 539, 545-546 [1983]). Because we conclude that none of the nonconstitutional issues resolves this proceeding in Quality King's favor, we consider its constitutional arguments.
With respect to Quality King's argument that certain statutory phrases are vague, and therefore void, under the federal Constitution, the Second Circuit has summarized the relevant void-for-vagueness principles as follows:
"'As one of the most fundamental protections of the Due Process Clause, the void-for-vagueness doctrine requires that laws be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.' Thibodeau v Portuondo, 486 F3d 61, 65 (2d Cir 2007) (internal citations and quotation marks omitted). 'A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.' VIP of Berlin, LLC v Town of Berlin, 593 F3d 179, 186 (2d Cir 2010) (internal quotation marks omitted). 'The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all" (Commack Self-Serv. Kosher Meats, Inc. v Hooker, 680 F3d 194, 213 [2d Cir 2012]).
Of course, a legislative enactment enjoys a strong presumption of constitutionality (see Two Wheel Corp., 128 AD2d at 510, affd on other grounds 71 NY2d 693 [1988]), and should not be struck down unless it clearly violates the Constitution (McKinney's Cons Laws of New York, Book 1, Statutes, § 150).
General Business Law § 396-r, which authorizes the AG to bring a civil proceeding to seek injunctive relief, restitution, and a civil fine, is an economic regulation, not a penal or criminal-type statute, and we therefore subject it to a relaxed-vagueness standard.
"[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action" (Village of Hoffman Estates v Flipside, Hoffman Estates, Inc., 455 US 489, 498 [1982]). An economic regulation is void when it is[*14]"so vague and indefinite as really to be no rule or standard at all" (Ruiz v Commissioner of Dept. of Transp. of City of New York, 679 F Supp 341, 351 [SD NY 1987] [internal quotations omitted], affd 858 F2d 898 [2d Cir 1988]; see A.B. Small Co. v American Sugar Refining Co., 267 US 233, 239 [1925]).
Viewed through the relaxed-vagueness lens, and reading the statute as a whole and viewing the various complained-of phrases in context, we conclude that the statutory phrases to which Quality King takes constitutional exception provide people of ordinary intelligence a reasonable opportunity to understand the conduct General Business Law § 396-r prohibits, and none of those phrases encourages arbitrary and discriminatory enforcement (see generally Two Wheel Corp., 128 AD2d at 510). To be sure, General Business Law § 396-r does not contain a quantitative metric for ascertaining whether a given price is unconscionably excessive or unconscionably extreme (or whether a given disparity between two prices is gross) (cf. General Business Law § 396-rr [milk price gouging statute]). The absence of such a metric, however, does not affect the statute's constitutionality (see Matter of Slocum v Berman, 81 AD2d 1014, 1015 [4th Dept 1981], appeal dismissed 54 NY2d 752 [1981] [the void-for-vagueness doctrine does not require impossible standards of specificity that would unduly weaken and inhibit a regulating authority]).
Because General Business Law § 396-r is not unconstitutionally vague under the federal Constitution and Quality King has pointed to no precedent suggesting that a different conclusion is warranted under the New York State Constitution, we reject Quality King's void-for-vagueness argument in its entirety.
We have considered the parties' remaining arguments and find them unavailing.
Accordingly, the order of the Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about September 23, 2020, which denied the petition for injunctive and financial relief under General Business Law § 396-r and Executive Law § 63(12), granted, in part, respondents' motion to dismiss, and, in effect, dismissed the proceeding, should be reversed, on the law, without costs, the petition and answer reinstated, and the matter remanded for further proceedings. The appeal by respondent Quality King from the same order should be dismissed, without costs (see CPLR 5511). The appeals from so-ordered transcript, same court and Justice, dated September 30, 2022, should also dismissed, without costs.
Order, Supreme Court, New York County (Eileen A. Rakower, J.), entered on or about September 23, 2020, reversed, on the law, without costs, the petition and answer reinstated, and the matter remanded for further proceedings. Appeal by respondent Quality King from the same order unanimously dismissed, without costs (see CPLR 5511). Appeals from so-ordered transcript, same court and Justice, dated September 30, 2022, unanimously dismissed, without costs.
Opinion [*15]by Higgitt, J. All concur.
Manzanet-Daniels, J.P., Shulman, Rodriguez, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: August 23, 2022

Footnotes

Footnote 1: The parties agree that the controlling version of the statute is the one that existed prior to the June 2020 amendments to the statute. The 2020 amendments "updated [General Business Law § 396-r] by expanding it to cover essential medical supplies and services and other goods or services used to promote the health or welfare of the public" (L 2020, ch 90, Introducer's memo [Sen. Hoylman]). The 2020 amendments represent the latest in a series of changes to the price-gouging statute, each expanding the consumer-protecting measures afforded by General Business Law § 396-r (see L 1995, ch 400 [broadening definition of "consumer goods and services" to include emergency repairs, and increasing maximum civil penalty from $5,000 to $10,000]; L 1998, ch 510 [expanding parties who are subject to price-gouging law to include any party within the chain of distribution; broadening definitions of "price gouging" and "excessive" prices; and clarifying that the burden of proof on the issue of justification for price increases rests with the respondent]; L 2008, ch 224 [increasing maximum civil penalty from $10,000 to $25,000]).

Footnote 2: The AG alleges that Quality King engaged in price gouging with respect to a variety of Lysol products; however, the AG's submissions in support of its petition do not suggest any specific instances of price gouging regarding Lysol products other than 19-ounce cans. Therefore, we focus our attention on the aspect of the petition asserting that Quality King engaged in price gouging with respect to the Lysol product.

Footnote 3: No judgment has been entered terminating this proceeding (cf. CPLR 411).

Footnote 4: Additionally, both parties appealed from a "so-ordered" transcript of the oral argument on the petition and Quality King's motion to dismiss. At the conclusion of that argument, the court stated on the record how it would determine the petition and motion to dismiss, and also stated that it would issue a short form order (i.e., the September 23, 2020 decision and order) containing the court's "ultimate findings." Because there are no material differences between the conclusions and rationale expressed in the September 23, 2020 decision and order, and the findings the court expressed on the record during oral argument, the parties' respective appeals from the so-ordered transcript are superfluous.

Footnote 5: Similar relief is available to the AG under Executive Law § 63(12) when the offending party engaged in "repeated or persistent fraud or illegality." That statute provides, in relevant part,

 "Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply, in the name of the people of the state of New York, to the supreme court of the state of New York, on notice of five days, for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts, directing restitution and damages and, in an appropriate case, cancelling any certificate filed under and by virtue of the provisions of section four hundred forty of the former penal law or section one hundred thirty of the general business law, and the court may award the relief applied for or so much thereof as it may deem proper."

Footnote 6: See, e.g., United States Centers for Disease Control and Prevention Museum's "COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last accessed July 22, 2022); The New York Times (online), "A Timeline of the Coronavirus Pandemic, https://www.nytimes.com/article/coronavirus-timeline.html (last accessed July 22, 2022); CNN (online), "COVID-19 Pandemic Timeline Fast Facts," https://www.cnn.com/2021/08/09/health/covid-19-pandemic-timeline-fast-facts/index.html (last accessed July 22, 2022).

Footnote 7: "National emergency" is not defined in the statute, so we give that phrase its ordinary meaning: an unforeseen combination of circumstances (or the resulting state) that calls for immediate action relating to the nation (see Merriam-Webster Online Dictionary, emergency and national). Alternatively, the common meaning of a "national emergency" is an urgent need for assistance or relief relating to a nation (id.). Similarly, Black's Law Dictionary defines a "national emergency" as "[a] state of national crises or a situation requiring immediate and extraordinary national action."

Footnote 8: Unlike the enumerated market-disrupting events that have given rise to the limited case law interpreting General Business Law § 396-r (i.e., "stress[es] of weather, convulsion[s] of nature, failure[s] or shortage[s] of electric power or other source[s] of energy"), the national emergency occasion by the pandemic has no obvious, discrete onset date; rather, it is the culmination of a host of circumstances, occurrences, and pronouncements. That it lacks a patent onset date does not, of course, mean that the coronavirus national emergency did not, in the eyes of the law, commence. In setting February 26, 2020 as the appropriate onset date, we have balanced the rights of Quality King, the remedial nature of General Business Law § 396-r, and the various milestone dates identified by the parties.

Footnote 9: The AG does not rely on the trade-area aspect of General Business Law § 396-r(3)(b).

Footnote 10: Certain of Quality King's customers made their first purchase of the Lysol product after February 26, 2020. No pre-onset price data exists for these customers. To ascertain whether any of these customers were gouged and, if so, the extent of the gouge, consonant with General Business Law § 396-r, the court should identify a similar-type customer who made a pre-onset purchase from Quality King. The court can compare the post-onset transaction of the new customer to the price charged by Quality King to the similar customer immediately prior to February 26, 2020, and gauge whether there is a gross disparity between the prices.

Footnote 11: Given that this matter is being remanded to Supreme Court for further proceedings as to the extent of the price gouging and the appropriate relief, we need not and do not address the parties' respective contentions regarding the latter. Those contentions are premature. We observe, however, that General Business Law § 396-r(4) suggests that a court must impose a civil penalty against a party who engaged in price gouging ("the court shall impose a civil penalty in an amount not to exceed twenty-five thousand dollars per violation or three times the gross receipts for the relevant goods and services, whichever is greater and, where appropriate, order restitution to aggrieved parties") (emphasis added) (see People v Beach Boys Equip. Co., 273 AD2d 850, 852 [4th Dept 2000]).